Argued September 14, judgment modified November 5, petition
for rehearing denied December 30, 1970

# SACHS, *Respondent, v.* PRECISION PRODUCTS
## CO., INC., *Appellant.*
### 476 P2d 199

*David W. Young*, Gresham, argued the cause for appellant. With him on the briefs were Weiser & Young, Gresham.

*William B. Wyllie*, Salem, argued the cause for respondent. On the brief were Otto R. Skopil, Jr., and Williams, Skopil, Miller, Beck & Wyllie, Salem.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN and TONGUE, Justices.

TONGUE, J.

This is an action by a distributor against a manu-

facturer for damages for breach of a franchise agreement, based upon allegations that the defendant "refused and neglected to deliver and perform said contract." The defendant denies that it breached the contract and by cross-complaint has asked the court to hold that plaintiff terminated the contract, based upon allegations that he refused to accept further deliveries and abandoned all efforts to sell the products.

Defendant appeals from a judgment for plaintiff for $16,192.26, including $11,614.74 for lost profits on undelivered orders, $3,400.45 representing down payments made by plaintiff on such orders, and $1,177.17 for moneys expended by plaintiff in the promotion and sale of the product. The trial court also denied defendant's cross-complaint.

In February 1966 the parties met and discussed the design, manufacture and sale of a small portable hoist. Eight months later no production model had yet been completed, but discussions and plans had progressed to the point that a contract was prepared and signed on October 18, 1966. By the terms of that contract plaintiff was given a five year exclusive franchise as a distributor for the sale of the "Atlas Hoist" in Oregon, Washington and California. Defendant was required to "supply any requirements of the distributor and make shipments promptly in accordance with the distributor's orders."

Plaintiff then opened an office and undertook a sales promotion program and arranged for distributors in Seattle and San Francisco. It was not until October however, that defendant developed and completed a production model that "worked reasonably satisfactorily."

On October 4, 1967, plaintiff placed his first order

with defendant for 100 hoists. Twelve days later, on October 16, 1967, Mr. Frizzell, the Seattle distributor, placed a written order with plaintiff for 50 hoists. Although plaintiff testified that this was "in addition" to his previous order, there was no evidence that it was ever transmitted by plaintiff to defendant and it was marked "Cancelled. Due to unforeseen delay in production. 11/15/67."① By the end of December 1967 only 46 of the 100 units ordered by plaintiff had been delivered.

In January 1968 plaintiff was informed that "trouble" had been encountered in lowering the hoist with a heavy load, involving the "piling up" of cable on the "capstan," with the possiblity of the cable "snapping," so as to cause an accident. Plaintiff then reported this to defendant's president, Mr. Wilcox, who verified the problem in tests of the hoist. Although plaintiff felt that the hoist was already a "good product," he testified that he "figured it was good business to have it corrected." Accordingly, the parties agreed that the units previously sold be picked up and returned for correction.

Mr. Wilcox then worked "about a month" designing a new "capstan." In that process he proceeded, by trial and error, to re-design 10 or 12 different models with slightly different angles and radii, each of which then had to be sent out to be "case-hardened," requiring three to four days. This experimental work was done personally by Mr. Wilcox and was not completed

---

① Plaintiff also testified that an order was received by him "over the phone" at some unspecified date and price from the San Francisco distributor for 100 units and that "they wanted a definite date of delivery." The trial court apparently considered this testimony too indefinite and disallowed plaintiff's claim of profit on that alleged order.

until March 1968. During that period work on orders for the hoist was stopped, although defendant's plant proceeded with other work for other customers.

Meanwhile, also in January 1968, plaintiff met with Mr. Wilcox to discuss the problem of delays in deliveries. He was then told by Mr. Wilcox that defendant did not have "enough money to operate." Plaintiff then suggested that he pay 50% "in advance with the orders," so as to "assist" defendant and "increase the speed" of production.

A new contract was then prepared, dated January 11, 1968. By its terms the new agreement "supercedes" [sic] the previous agreement of October 1966 and "constitutes the entire understanding of the parties." It also provided that plaintiff was to have an exclusive franchise, without limitation of territory and for a period of ten years. He was, however, still required to purchase a minimum of 100 units each year, as under the previous contract. Also, the shipping requirements were changed so as to provide that upon receiving written orders defendant was to "immediately notify distributor of the date upon which the items ordered shall be shipped" and was to be "liable for general damages caused by delay in delivery or failure to manufacture due to its fault or negligence," but not for causes "beyond its reasonable control."[2]

During the following six weeks plaintiff delivered two additional purchase orders to defendant. Thus, on January 30, 1968, he ordered 100 hoists with the notation under "Date Required—March 1/68." On February 17, 1968, he ordered an additional 100 units with

---

[2] It does not appear from the record whether the discussion and agreement to re-design the hoist to correct the "piling up" problem was before or after the execution of the new contract.

"Date Required—April 1/68." These orders were accompanied by payment of 50% down, in the total sum of $3,400.45.

During that period Mr. Frizzell, the Seattle distributor, on February 19, 1968, submitted to plaintiff another order for 100 units, at a price "as agreed" in the sum of $49.75. Again, however, there is no evidence that this order was transmitted to defendant, much less that a 50% deposit was made upon it, and the order bears a notation by plaintiff, dated March 18, 1968, to the effect that it was returned unfilled for the reason that "we are still in the process of correcting the faulty capstan and we will not be able to make shipment on the date specified."

Plaintiff testified that in May 1968, after receiving no notification of shipping dates for his last two orders and apparently after receiving further excuses and promises from defendant (although the correction of the design of the faulty capstan had been completed sometime in March), plaintiff asked defendant for the return of his down payment. Defendant testified that this demand was made in April 1968.

On May 9, 1968, defendant mailed an "acknowledgment of order" to plaintiff, stating that it expected to ship the order dated January 30, 1968, "on or about October 31, 1968" and the order dated February 17, 1968, "on or about December 20, 1968." At "some time after May 9, 1968," plaintiff called defendant's office and stated that he would not accept delivery of any more hoists and was turning the matter over to an attorney. He was told at that time by defendant's employees that he had been "very patient" in waiting for the deliveries. Defendant also admitted that the reason for the delays in shipment was that the hoist

had originally not been properly designed, but contends that plaintiff was aware of the problems in correcting the design.

Plaintiff also testified that while defendant offered to return the down payment, it would do so only on condition that he agree to a termination of the contract. Plaintiff contends, however, that he still has the exclusive contract right to sell all hoists produced by defendant and that he is willing to buy the hoists from defendant "at any time."

On the other hand, plaintiff admitted that the hoist is a "unique product," for which there is no "substitute," and that the purchasers who were willing to buy the hoist in March 1968 are still willing to buy it "at any time." Nevertheless, in April 1968 (even before demanding return of his deposit), plaintiff stopped all efforts to sell the hoist and in July took on another product for sale during the last six months of 1968.

(1) *Defendant breached the contract and was not entitled to its cancellation or rescission.*

■ Under these facts defendant contends, among other assignments of error, that the trial court erred in finding that defendant breached the contract and also in finding that defendant was not entitled to cancellation or rescission of the contract.

In support of the first of these contentions defendant urges that its delays in delivery of the hoists were not material breaches of the contract. Defendant also contends that such delays were excused by the difficulties involved in re-designing the hoist; that plaintiff was aware of these problems and that, in any event, the delays did not cause damage to the plaintiff.

Upon examination of the record in this case we con-

clude that the finding of the trial court that defendant was guilty of a breach of contract was supported by substantial evidence. Although the contract contained no "time essence" clause it was nevertheless implied that deliveries would be made within a reasonable time. The only testimony was that a period of 30 days was a reasonable time for such deliveries, according to business custom.

The contract provided that upon receipt of the orders in January and February defendant would immediately notify plaintiff of the date upon which shipment was to be made. This did not, however, give defendant the right to withhold or delay such shipments beyond such a reasonable period of time. In any event, defendant completely failed even to give notice of delivery dates, as required by the contract, until May 9, 1968, and then specified delivery dates more than nine months after the dates of such orders.

While is is true that defendant encountered difficulties which made it extremely difficult to make prompt deliveries and that plaintiff was aware of these problems, it is established in Oregon that unexpected difficulties and expense do not excuse performance of a contract unless so extreme that a practical impossibility exists and resulting in a hardship so extreme as to be outside any reasonable contemplation of the parties— a test not satisfied by the facts of this case. *Savage v. Peter Kiewit Sons' Co.*, 249 Or 147, 153, 432 P2d 519 (1968). See also 6 Corbin on Contracts § 1333, and 6 Williston on Contracts § 1963. Cf. ORS 72.6150. And while the extent of damage resulting from a contract breach may be a factor to be considered in determining whether the breach is material (cf. Restatement of the Law, Contract § 275), it is not alone sufficient to re-

quire a different result, at least under the facts of this case.

■ In any event, it must be kept in mind that in this case plaintiff does not contend that defendant's breach was so substantial as to constitute a "total breach" of the contract, entitling plaintiff to terminate the contract. Indeed, plaintiff does not seek to terminate the contract, but demands payment of damages resulting from defendant's failure to make deliveries of past orders placed by it with defendant. See 4 Corbin on Contracts §§ 946, 948.

Defendant's further contention, to the effect that plaintiff, rather than defendant, was guilty of a total breach of the contract, so as to entitle defendant to its termination or rescission, must also be rejected.

It is true that in May 1968 plaintiff informed defendant that he would accept no further deliveries from defendant and that he also demanded the return of deposits on previous orders and ceased further sales efforts. It must be remembered, however, that at that time defendant was itself in breach of the contract by its failure to acknowledge such orders with notice of shipping dates and by failure to make deliveries within a reasonable time.

■ Furthermore, it is well established in Oregon that even if plaintiff's conduct had been sufficient to constitute an attempted renunciation or repudiation of the entire contract, such a renunciation or repudiation of the contract was not effective in this case because it was not accepted or acted upon by defendant prior to the filing of plaintiff's complaint on July 1, 1968, which, in effect, withdrew any such renunciation or repudiation of the contract by its allegation that plaintiff "stands ready to perform the same." *Peeler v. Tarola*

*Motor Co.,* 170 Or 600, 608-610, 134 P2d 105 (1943);
*Swick v. Mueller,* 193 Or 668, 677, 238 P2d 717 (1952).

Whether or not, subsequent to the filing of his complaint, plaintiff has resumed, or offered to resume, performance of his duties under the contract, such as by the placing of at least 100 orders each year, with down payments as required by the contract for its continued existence, is not before the court in this case.

(2) *The award of damages to plaintiff included items which were improper.*

Defendant assigns as error the finding of the trial court that the contract dated January 11, 1968, merely "modified" the previous contract of October 18, 1966, instead of replacing and discharging that contract, and that this resulted in the improper award of damages under the original contract.

Plaintiff contends, on the contrary, that a subsequent contract does not discharge a prior contract "if it is not agreed that it shall and it is not inconsistent therewith," citing 3 Corbin on Contracts 373-375, § 574. Plaintiff also contends that the 1968 contract was not intended to supersede the 1966 contract, but only to "help" defendant by providing funds as a result of the new provision for down payments, and that there were only two other minor changes.

■ An examination of the 1968 contract, however, reveals substantial changes and "inconsistent" provisions, as previously discussed. In addition, the new franchise agreement expressly stated that it superseded the previous agreement and constituted the entire understanding of the parties. It follows that upon execution of the contract of January 9, 1968, the contract of October 18, 1966, was discharged, including all

duties and obligations by either party under that contract. *Dorsey et ux v. Tisby et ux*, 192 Or 163, 173, 234 P2d 557 (1951). This included defendant's duty to deliver the remaining 54 units of the original order for 100 units, as placed under the 1966 contract.

Thus, instead of allowing plaintiff's claim for damages on 254 undelivered units, such damages should have been limited to defendant's failure to deliver the 200 units included in the two orders placed by plaintiff under the new contract.

■ The court also erred in allowing additional damages for the 150 units ordered from plaintiff (not defendant), by Mr. Frizzell, the Seattle distributor. Again, part of these units were also ordered prior to the contract of January 11, 1968, and although the remaining units were ordered after that date, there was no evidence that such an order was transmitted by plaintiff to defendant, much less that a 50% down payment was made to defendant on that order, as required to impose upon defendant a duty to deliver that order.

Defendant also assigns as error the finding of the trial court that plaintiff was entitled to an award of general damages in the form of profits lost on the undelivered orders, upon the ground that the amount of such profits was speculative and had not been proved with reasonable certainty. In addition, defendant assigns as error the finding that plaintiff was entitled to special damages representing expenses claimed by plaintiff to have been incurred as promotion and sales expenses, particularly those incurred prior to January 11, 1968, the date of the second contract.

Plaintiff responds with the contention that uncertainty as the *amount* of lost profits is "not fatal" and

that, in any event, the amount of the profits that would have been earned on the orders which defendant failed to deliver was proved with reasonable certainty. Plaintiff also contends that he was entitled, in addition, to an award of special damages for the amount of his promotion and sales expenses under the rule of *Hockersmith v. Hanley*, 29 Or 27, 44 P 497 (1896) ; *Bredemeier v. Pacific Supply Co.*, 64 Or 576, 131 P 312 (1913) ; and *Howland v. Iron Fireman Mfg. Co.*, 188 Or 230, 213 P2d 177 (1950).

It is now the established rule in Oregon that in order to recover damages for lost profits, both the existence and the amount of such profits must be proved with reasonable certainty. *Douglas Construction Corp. v. Mazama Timber Products, Inc.*, 256 Or 107, 471 P2d 768 (1970), and cases cited therein. We hold, however, that in this case plaintiff offered sufficient evidence to support the finding of the trial court, with reasonable certainty, that he would have made a *gross* profit of $37.06 per unit on the 200 hoists ordered by him under the contract of January 11, 1968; i.e., the difference between the price payable by plaintiff to defendant for such units and the price which he would have received on sale of such units.

Since, however, plaintiff was entitled to no more than the *net* profit from such sales, it follows that the expenses incurred by him in the promotion and sale of these units were expenses which plaintiff was required to pay in order to earn such profits, rather than to charge such expenses to defendant. This is particularly true, under the facts of this case, in which most of such expenses were incurred under the original contract, which was discharged, and some undefined portion of such expenses would appear to be more prop-

erly allocable to plaintiff's ordinary cost of doing business, as distinguished from promotional expenses.

In *Howland v. Iron Fireman Mfg. Co., supra,* a distributor also contended, as in this case, that he was entitled to payment by the manufacturer not only for the gross profit that he would have earned on goods not delivered, but also for overhead and operating expenses incurred by him. That claim was rejected by this court at p 299, stating that:

"In any event, plaintiff could only be entitled to his net profit. Furthermore, on the most liberal view of the proceedings plaintiff was not entitled to recover expenses in addition to profits as claimed by him in the testimony quoted."

To the same effect, as stated in 17 ALR2d 1318:

"The rule applies similarly in the case of a sales agency or distributor's contract. Even if the contract contemplates preliminary expenditures of time or money by the agent or buyer—as for advertising or traveling or even leasing and fitting up salesrooms—he cannot recover these in addition to his prospective profits on the articles to be sold, figured, for example, as the difference between the price to him and the price at which they would be sold, less the future cost of selling them."

See also McCormick on Damages § 142.

As we read *Hockersmith v. Hanley, supra,* and *Bredemeier v. Pacific Supply Co., supra,* the results in those cases, as applied to the facts of such cases, do not require a different result, as applied to the facts of this case. Also, as previously stated, this is not a case in which plaintiff is contending that the contract has been terminated by its total breach by defendant, with the result that some of such expenses might be more properly allocable, as in *Bredemeier, supra.* In any

event, to the extent that those cases may appear to require a different result in this case, they have been superseded, if not overruled, by *Howland v. Iron Fireman Mfg. Co., supra.*

■ From the foregoing discussion it is clear that the identity of the various items of damage payable to plaintiff, together with the amount properly payable for each item, can be determined from the record before this court. Therefore, rather than to remand this case for new trial, with the resulting delay and expense, and under the power conferred upon this court by Art VII, § 3 (Amended) of the Constitution of the State of Oregon, this case is remanded with instructions that judgment in favor of plaintiff and against defendant be entered in the sum of $10,812.45, to include general damages for loss of profits on the 200 hoists, at $37.06 each, for a total of $7,412, and special damages in the sum of $3,400.45, representing the down payments on such orders. Plaintiff is still entitled to payment of costs on the original trial, but defendant is entitled to costs on this appeal.

Modified.