ASPGREN et al, *Respondents,*
*v.*
CITY OF COLUMBIA CITY, *Appellant.*
(No. 21654, CA 8958)

CITY OF COLUMBIA CITY, *Appellant,*
*v.*
KELLY et al, *Respondents.*
(No. 22419, CA 8958)
(Cases consolidated)
581 P2d 536

Harold L. Olsen, St. Helens, argued the cause for appellant. With him on the briefs was Vagt, Olsen & Coon, St. Helens.

Robert P. VanNatta, St. Helens, argued the cause for respondents Esther N. Kelly; Fredrick E. Rickert and Donna R. Rickert, husband and wife; G. W. Trent and Alice Trent, husband and wife; Harrell L. Barnes and Bette J. Barnes, husband and wife; Wales Wood and Ruth MacFarlane Wood, husband and wife; Alvin A. Weber and Blanche N. Weber, husband and wife; Charles G. Ross and Winnifred May Ross, husband and wife; Robert W. Morrissey and Ida K. Morrissey, husband and wife; Jess W. Davis and Ida V. Davis, husband and wife; Chester J. Thorp and Barbara E. Thorp, husband and wife; Hazel C. Wysock; James A.

[ 992-a ]

McBride, Jr. and Dolores Jean McBride, husband and wife; Albert A. Manly and Bette Manly, husband and wife; Kenneth R. Aspgren and Edith M. Aspgren, husband and wife; Sue Young Chin; James T. Carrie, Jr. and Betty M. Carrie, husband and wife; John G. Ericksen and Fern D. Ericksen, husband and wife; Gerald E. Eisenzimmer; and Donald Baker and Mary Ann Baker, husband and wife. On the brief were George G. VanNatta and VanNatta & Petersen, St. Helens.

No appearance for respondent Reynolds Metal Company, a foreign corporation.

No appearance for respondents Susie B. Dillard, and W. W. Dillard and Gerta H. Dillard, husband and wife.

Before Schwab, Chief Judge, and Thornton, Tanzer and Buttler, Judges.

BUTTLER, J.

**BUTTLER, J.**

Columbia City (City), plaintiff in one, and defendant in another, of two suits consolidated for trial, appeals from the judgment of the trial court declaring the rights of the respective parties under two agreements relating to the provision of water service to respondents.

The issues are framed by the historical events which resulted in the development of water service in the area of Chimes Crest, just south of, but not within, the City. To understand the issues, a detailed statement of the facts[1] is necessary.

I

The Chimes Crest area is divided into easterly and westerly segments by U.S. Highway 30. At present, there are approximately 30 separate land ownerships being served, or capable of being served, by the Chimes Crest water line. There are currently 22 separate connections to this water line.

In 1939, virtually all of the relevant land west of the highway was owned by Mary Beaton Whittier and the Caples family, and all of the land on the east side of the highway was owned by Mary's brother-in-law, Harvey Jordan. In 1939, the Caples family and Mary Beaton Whittier sold to the City for use as a reservoir site a parcel of land west of the highway on which there were wells used by the grantors for their domestic water supply. The deed to the City contained the following provision:

> "By the acceptance of this deed the grantee does hereby agree that water for household purposes, and fire protection shall be available to the present properties and premises of the grantors lying Easterly and Southerly of said reservoir site, from grantee's system, at the same rate and charge made against users within the municipality, provided however, that all ditches, pipes,

---

[1]The facts recited are taken primarily from appellant's brief; respondents concede their accuracy for purposes of this review.

[ 993 ]

connections and other required devices shall be furnished and supplied by the grantors or those desiring water service."

Also in 1939, the City passed a general obligation bond issue to finance the construction of a water main to serve Chimes Crest, and in 1941 the water main was installed along U.S. Highway 30.

At that time U.S. Highway 30 was a two-lane highway. The water main constructed by the City was installed along the east edge of the highway within the highway right-of-way. As the Chimes Crest area began to develop, service connections were made to the water line. Sometime during the course of events, property owners on the west side of the highway installed two separate water lines which ran from the main line across and underneath the highway to their homes.

Five of the property owners on the east side of the highway, and who were not privy to the covenant in the deed, entered into a Domestic Water Service Agreement with the City in 1941 at or about the time the main water line was installed along the highway. That agreement contained the following language:

"* * * The City does hereby agree to furnish and supply unto the said individuals, for the uses hereinbefore stated, such municipal water or water from said municipal system as may be available therein and therefrom under the rules and regulations for the operation of the municipal water system as adopted by said City with regard to furnishing of water, the collection of water accounts and all general provisions and for such period of time as the said individuals may continue to comply with all of said regulations and provisions, and the said City does further agree that in the event of change in the water rates charged by the said City generally, whether increased or decreased, the rates and charges made and levied against the said individuals shall at all times be retained at the same ratio to the rates charged users within the municipality as at present exists between the dates herein set forth and the

[ 994 ]

said municipal rates, provided however that the said annual hydrant rental shall remain and is a fixed sum * * *."

Of the five parties who signed this agreement, only respondents Wood and Kelly remain as owners of property within the Chimes Crest area. None of the other property owners on the east side of the highway who presently receive water from the City have entered into a written agreement with respect to water service.

From the very beginning, a distinction was made in the rates charged water users living within the City limits and those living ouside the City limits. Upon completion of construction of the water main, a fee of $1.50 per month was charged for water users within the City and a fee of $2 per month was charged for water users outside the City. The same charge was made regardless of which side of the highway the user lived on. Over the years, several changes have been made in the water rates.[2]

In 1954, work was begun by the Highway Commission to widen and improve U.S. Highway 30 from the St. Helens city limits north through the Chimes Crest area and Columbia City to a point several miles north of Columbia City. The highway was widened from a two-lane road to a four-lane road in the Chimes Crest area. Because of the widening of the highway, it was necessary to make some changes in the water line. The

---

[2]The following table illustrates the relative rates for inside and outside City dwellers over time:

| Ordinance | Date | Inside City | | Outside City | |
|---|---|---|---|---|---|
| | | Rate | Service Fee | Rate | Service Fee |
| | 1940 | 1.50 | 0 | 2.00 | 0 |
| 181 | Sept. 1960 | 1.50 | 0 | 3.00 | 0 |
| 212 | Sept. 1964 | 1.50 | 1.00 | 3.00 | 1.00 |
| 231 | Aug. 1966 | 2.50 | 1.00 | 3.00 | 1.00 |
| 271 | May 1971 | 2.50 | 1.00 | 3.30 | 1.00 |
| 310 | Sept. 1974 | 7.00 | 1.00 | 7.80 | 1.00 |
| 313 | Feb. 1975 | 6.00 | 0 | 7.80 | 1.00 |

city council, the Chimes Crest residents and the Highway Commission held several meetings concerning the moving of the main line and the service lines crossing under the pavement to the residents on the west side of the highway.

Minutes of a special meeting between the City officials and the Highway Commission officials indicate that an agreement was reached whereby the State would pay the expenses of moving the water lines that would have to be moved because of the new highway construction work. However, the minutes do not indicate who was to determine, or how it was to be determined, which water lines would be moved. According to Roy Pyle, who was the resident Highway Commission engineer for the highway construction, the widening of the highway made it necessary to relocate the Chimes Crest water line in two locations. In addition, it was also necessary to replace broken service lines, lower part of the main line and move some meters. He testified that there was no agreement between the City and the State to move the entire pipeline.

The City did all of the work in repairing and relocating the water lines and was reimbursed by the State for the labor and materials expended after the work and the bills were approved by Mr. Pyle. The City billed the State of Oregon $6,017.31 for reimbursement of the expense of materials and labor incurred while making necessary water line changes and repairs. The pipeline repairs were not limited to the Chimes Crest area. Some of the work for which the City was reimbursed involved pipelines located elsewhere. The City did not bill the State, and was not paid by the State, until after the work was done.

At no time did the Chimes Crest residents, east or west of the highway, pay for any portion of the construction, repair or relocation of the Chimes Crest main line either during original installation or as a result of the highway relocation.

[ 996 ]

In September, 1964, Ordinance No. 213 was adopted by the City. It assessed nonresidents an additional $1 per month as a water service charge. The ordinance went on to provide:

"Section 2. Any and all sums of money received by the city pursuant [to] the provisions of this ordinance shall be kept and accounted for in a separate fund which is hereby established and to be known as the 'Nonresident Water Service Charge Fund.' "

The special fund referred to in the ordinance was not established despite the fact that the extra $1 service charge was collected. Witnesses for the City testified that the money so collected went into the general water fund and was used for maintenance and repairs. Further testimony revealed that 46 water meters had been replaced in the Chimes Crest area between 1969 and 1973 at a price of $35 per meter, and that the Chimes Crest residents were not charged for those replacements. Additionally, there had been six breaks in the Chimes Crest water line since November, 1973, the last three of which cost, on the average, $400 to repair. Although these costs were billed to the residents, only four parties paid their pro rata shares of the first bill, and the City ended up paying the remaining costs.

After experiencing these breaks, the city council decided that the water line needed to be replaced. On September 17, 1974, a letter was mailed to the residents of Chimes Crest, the problem was explained, alternatives for paying the cost were proposed and a deadline was set for a requested response by the residents. No agreement was reached as a result of the letter. The City next attempted to create a local improvement district in accordance with its general improvement ordinance so that the water line could be constructed and the cost assessed against the benefitted property owners. However, the property owners filed sufficient remonstrances to defeat the proposal.

In January of 1975, the city engineer reported that the main line serving the Chimes Crest area was

corroding and was deteriorating because of traffic driving over the highway on top of it; that maintenance had become expensive, difficult and hazardous; that due to the water pressure and the weakness of the pipe, it was necessary to let water run out on to the ground at the end of the pipe. In short, it needed to be replaced; it has served its reasonable life expectancy of 30 years. The City advised the respondents of its intention to discontinue water service to them unless they agreed to pay the cost of replacing the line. Respondents contended the City was obligated to replace the line.

## II

To break the stalemate, a suit for declaratory relief was filed against the City by property owners on the west side of the highway, in which they prayed for, among other things, a declaration that the City was obligated to continue to provide water service to them and should be required to account to them for "excessive charges." That suit only involved property owners on the west side of the highway. In order to obtain a final determination of the rights of all of the parties on both sides of the highway in the Chimes Crest area, the City filed a complaint in the same court, joining all property owners involved, asking for a declaration of the rights of the respective parties with respect to the Chimes Crest water line, and in particular asked for a determination that the City was not obligated to continue water service to respondents unless respondents paid the cost of installing a new water line. The two cases were consolidated for trial.

The trial court held that: (1) the covenant in the deed was a covenant running with the land, and that the grantors' successors in interest were required to provide their own delivery system from the City's reservoir; (2) the 1941 Water Service Agreement was personal to the signators thereto, and that only the original parties who were still living on their original

property were entitled to the benefits of the agreement, which obligated the City to provide water service to them, subject to the same rules and regulations applicable to water users within the City with respect to repairs or replacements; (3) notwithstanding the foregoing determinations, since the City received money from the State for the purpose of replacing the pipeline in 1954, but did not do so, the City was now responsible for replacing the pipeline at its sole expense; and (4) respondents were entitled to an accounting, and should be reimbursed for excess service charges paid by them, apparently without regard to any statute of limitations which might be applicable.

### III

The City's first assignment of error is that the court erred in determining that the City is obligated to replace the existing pipeline at its sole expense. The trial court's determination was based upon events which allegedly occurred in 1954 at the time the highway was widened, regardless of the covenant or the Water Service Agreement. We disagree; the record does not establish that the City was paid by the State to relocate the pipeline in 1954, but failed to do so. Rather, the evidence, although somewhat sketchy, indicates that the State reimbursed the City for work the City actually did on the pipeline, both within the City limits and in the Chimes Crest area, most of which was necessitated by changes in grade and alignment of the highway. The City received no funds until the work it performed was completed and approved. We find nothing in the record which would lead to the conclusion that the City had an obligation to move the pipeline. Furthermore, respondents' contention that the City had an affirmative obligation to compel the State to move the pipeline during the highway construction is not supported by any authority, and we know of none.

Even if the City had the power to compel the State to pay in full for the removal of the entire pipeline

from the State's right of way, a doubtful proposition at best, *Urban Renewal v. Pacific N.W. Bell*, 23 Or App 384, 542 P2d 908 (1975), *rev den* (1976), exercise of that power was within the discretion of the City. *Kershaw et al. v. City of Willamina et al.*, 119 Or 543, 250 P 235 (1926).

Concluding, as we do, that the events which occurred in 1954 do not impose an obligation on the City to install a new water line does not, however, end the matter. We must determine the effect of the deed covenant, with respect to west side owners, and the Water Service Agreement, with respect to east side owners.

### A.

■ We agree with the trial court that the deed covenant is one which runs with the land, and that the successors in interest of the grantors are entitled to the benefits thereof. Construing the covenant as a whole, we conclude that the City is obligated to make water from the reservoir site available to grantors' remaining property for household purposes and fire protection at the same price charged to users within the City limits, but grantors are required to supply "all ditches, pipes and connection" to obtain such water. Accordingly, grantors and their successors had, and now have, the right to pipe water from the reservoir site to their respective premises at their expense.

■ However, for reasons not disclosed by the record, that was not done in 1941. Instead, the City installed a main line along the highway to be used not only by those on the west side, but also those on the east side. The City paid for the line by general obligation bonds. It appears that the parties to the covenant construed the covenant as not imposing an obligation on the grantors to pay for the installation of the main line. The conduct of the parties to an agreement and their practical interpretation of it is strong evidence of its meaning. *Krieg v. Union Pacific Land Res. Corp.*, 269 Or 221, 525 P2d 48 (1974). While the contemporaneous

[ 1000 ]

interpretation of the covenant leads to the conclusion that the grantors were not obliged to pay the cost of installing the main line, it does not follow that the City was obligated to install it under the terms of the covenant.

■ Accordingly, the covenant is not applicable to the present dispute: it neither requires the City to replace the main line, nor does it require the grantors to pay for such replacements. The grantors and their successors, except for the special rates applicable to them, are in the same position as any other owners of property outside the City abutting a local improvement.

B.

■ We also agree with the trial court that the 1941 Domestic Water Service Agreement between the City and the east side property owners was personal to the signators, of whom only two remain. However, by the terms thereof, the City agreed to "furnish and supply unto the said individuals * * *" water from the City's municipal system, of which the reservoir is a part. We hold, therefore, that the City has a contractual obligation to supply water to those two owners, but such obligation is pursuant to "the rules and regulations for the operation of the municipal water system as adopted by said city with regards to furnishing of water, the collection of water accounts and all general provisions * * *."

The effect of that agreement was to obligate the City to supply water service to the signators, to obligate the signators to connect to the water line and to pay the specified charges for the service. In all other respects, those owners were and are in the same position as any other owner receiving water services outside the City.

IV

■ The City's second assignment of error is that the trial court erred in "reopening" the case to take evidence relating to the amount of overcharges

claimed by all of the respondents to have been imposed by the City. There is no merit to the contention. Among the relief sought by respondents was a declaration that they were entitled to an accounting. Until the court made that determination, evidence of the claimed excessive charges was not appropriate. The hearing with respect to the amount of overcharges for which the City had to account was held approximately 2½ months after the court had rendered its oral opinion and before any judgment was signed by the judge. At that hearing the parties stipulated to certain dollar figures, although the City objected to the "reopening." As the matter was handled, we view the subsequent hearing as a continuation of the original proceedings. As such, it was neither a "reopening" nor was it improper.[3]

## V

The City contends in its third assignment of error that the trial court erred in the amount of refund it determined to be owing to the various respondents because it did not limit the calculation thereof to the applicable period of limitations. Respondents contend here, for the first time, that defense was waived by failure of the City to demur, ORS 16.260(7),[4] or to

---

[3] ORS 28.080 provides:

"Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application thereof shall be by petition to a court having jurisdiction to grant the relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith."

Under that statute a more appropriate procedure would be to enter the judgment declaring the rights of the parties, and leave it up to the party seeking relief supplementing the judgment to apply to the court for supplemental relief.

[4] ORS 16.260(7) provides:

"The defendant may demur to the complaint within the time required by law to appear and answer, when it appears upon the face thereof:

"* * * * *

"(7) That the action has not been commenced within the time limited by statute."

assert the defense in its responsive pleading. ORS 12.010.[5]

The situation is ambiguous and confusing. The proceedings involve two suits for declaratory relief which have been consolidated. Taken together, the pleadings in the two suits ask for a declaration of rights of all of the parties under the covenant and Water Supply Agreement, including a prayer by respondents for a determination that they are entitled to an accounting for excessive charges under each of those documents. None of the pleadings, on their face, was subject to demurrer. Undoubtedly, the City could have pleaded hypothetically that if the respondents were entitled to an accounting, they were only entitled to one covering the years immediately preceding equal to the applicable period of limitation.[6] However, until it was determined that respondents were entitled to an accounting, such allegation would seem premature, and would have accomplished nothing: the parties were entitled to a declaration of their rights, including a determination as to whether respondents were entitled to an accounting.

At the time of the hearing referred to in IV, *supra,* the City contended that it had to account only for the preceding six years on the theory that each claim was premised on breach of contract. ORS 12.080.[7] Counsel

---

[5]ORS 12.010 provides:

"Actions at law shall only be commenced within the periods prescribed in this chapter, after the cause of action shall have accrued, except where a different limitation is prescribed by statute. The objection that the action was not commenced within the time limited shall only be taken by answer, except as provided in ORS 16.260."

[6]In its Reply to the Answer of the east side owners, the City alleged that those respondents were guilty of laches and had waived any objection they might have to the charges because they had been paying them for more than six years.

[7]ORS 12.080(1) provides in relevant part:

"(1) An action upon a contract or liability, express or implied, * * * shall be commenced within six years."

The same limitations period applies to suits in equity, ORS 12.040.

for the parties had stipulated to certain dollar figures, one of which applied if no statute of limitations was applicable, and one of which applied if the six-year statute was applicable. Counsel for respondents did not contend that the City had waived the defense or application of the statute, and the court, without hearing argument or articulating a decision adopted the first set of figures.

With the proceedings in the posture outlined above, we cannot say that the City waived the defense with respect to the period over which it was bound to account to respondents.

■ ■■ There remains the question as to which limitation period is applicable. The City contends that the six-year statute applies. We agree with respect to the Domestic Water Service Agreement. The covenant, however, is contained in a deed, which was executed under seal before August 13, 1965, and is, therefore, covered by ORS 12.070[8] providing for a ten-year period of limitations.

## VI

The City's final assignment of error is that the trial court erred in determining that:

> "10. Chester J. Thorp and Barbara J. Thorp have maintained for the benefit of their property, a separate system for withdrawing water from the city system and neither they nor their property should in any way be responsible for the existing Chimes Crest line or any repairs thereof."

The Thorps are residents in the Chimes Crest area west of the highway, and have done what we concluded the grantors and their successors may do under the deed covenant. What we have said under III A, *supra,*

---

[8]ORS 12.070 provides:

"(1) An action upon a judgment or decree of any court of the United States, or of any state or territory within the United States; or

"(2) An action upon a sealed instrument entered into before August 13, 1965,

shall be commenced within 10 years."

with respect to the grantors and their successors, applies equally to respondents Thorp, and no special determination need be made with respect to them.

The judgment and decree is affirmed in part, reversed in part, and remanded for entry of judgment and decree consistent with the opinions expressed herein.