Argued and submitted March 12, affirmed December 8, 1982, reconsideration
denied January 28, petition for review denied February 23, 1983 (294 Or 536)

UNITED STATES NATIONAL
BANK OF OREGON et al,
*Respondents,*
*v.*
CALDWELL,
*Appellant,*
*and*
ANDERSON et al,
*Appellants.*

(No. 80-84, CA A21083)

655 P2d 180

Robert J. Miller and William L. Larkins, Jr., argued the cause for appellants. With them on the briefs was Black, Kendall, Tremaine, Boothe & Higgins, Portland.

Susan M. Hammer, Portland, argued the cause for respondents. On the brief was Phillip D. Chadsey, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

■ This dispute involves an agreement for the development of mineral properties in Baker and Grant Counties. Plaintiffs, the personal representative of the estate of Anthony Brandenthaler and Mary Brandenthaler, sought and the trial court granted a decree declaring the forfeiture of the rights of defendant Caldwell under the agreement and granting restitution of the properties.[1] Anderson and Barnes, investors in the mining operations, are defendants-in-intervention.[2] Defendant and intervenors contend that defendant complied with the terms of the agreement and that the declaration of forfeiture was error. The requested relief is equitable in nature; therefore, we review *de novo*. Although we are not bound by the trial court's findings, considerable weight must be accorded those findings where the testimony, or the inferences to be drawn from it, are in dispute, because of its opportunity to see and hear the witnesses. *Hampton v. Sabin,* 49 Or App 1041, 1047, 621 P2d 1202 (1980), *rev den* 290 Or 519 (1981).

### THE PURCHASE AGREEMENT

On April 20, 1979, the Brandenthalers entered into a "Purchase Agreement" with defendant.[3] It provided that the Brandenthalers would sell their interests in "mineral properties" they owned or controlled through various lease-option agreements to defendant for $1,600,000, to be paid from the net proceeds of gold mining operations ("placering" and "leaching") to be established at the Virtue mine, one of the subject properties. When the full price had been paid, the Brandenthalers were to turn over their interests to defendant. Until that occurred, the agreement was, in effect, a mineral lease. Defendant also agreed to obtain public liability and workers' compensation insurance and

---

[1] Plaintiffs also sought a declaration that Caldwell had no interest in the properties and quieting title and also sought an injunction against defendant's asserting any interest in the properties.

[2] Intervenors invested approximately $265,000 in the operation in return for a 10 percent share of defendant's "equity interest" in the properties.

[3] The agreement refers to defendant as "Harold D. Caldwell, Trustee" but does not specify for whom he was acting in that capacity.

to indemnify the Brandenthalers against claims arising out of expenses and debts of the development.[4]

This dispute concerns defendant's alleged failure to follow through with the gold extraction operations. The controlling provisions are not models of clarity:

"5. CALDWELL shall complete above mentioned leach circuits for operations.

"6. CALDWELL shall construct two additional leach pads at the Virtue after said operation and test runs have proved to be satisfactory and feasible for profit to all parties concerned.

"7. CALDWELL shall move in equipment and personnel necessary to commence said operation within 60 days of the signing of this contract to process said dump in fulfillment of his obligation."

"* * * * *

"12. If operations are not commenced with[in] 60 days of the signing of this agreement and carried forward as an operation completing leaching of the estimated 200,000 ton dump, or if operations are abandoned for any reason, CALDWELL'S right to further operations shall terminate and CALDWELL shall give peaceful possession of said properties immediately to BRANDENTHALERS without recourse or process of law."

Defendant's duties under paragraphs 5 and 6 are not in dispute. The parties do not agree, however, on the performance required by paragraphs 7 and 12. Defendant argues that, because he "did move in equipment and personnel necessary to put the leaching circuit in operation within 60 days of April 20, 1979, * * * [he] was in compliance with paragraphs 7 and 12." He contends that any ambiguity should be resolved against the Brandenthalers, who drafted most of the provisions. The parties' intention is found in the language used and the surrounding circumstances. *Spooner v. Polk County,* 19 Or App 557, 562, 528

---

[4] The agreement also provided that: (a) profits would be divided after the deduction of costs and expenses of "on-site recovery and production"; (b) defendant had the right to remove equipment placed on the property if he abandoned the operation but was required to grant the Brandenthalers a 60-day option to purchase it; (c) the rights of either party could be assigned; (d) if "any covenant whatsoever, of any part of [the] contract is breached or violated, this agreement shall be forfeited"; and (e) the cost of fulltime employees would be shared.

P2d 597 (1974). We must construe the agreement as a whole, employing reasonable methods of interpretation so that we may give effect to every word and phrase, if possible, *New Zealand Ins. v. Griffith Rubber,* 270 Or 71, 75, 526 P2d 567 (1974), and we must attempt to read the paragraphs together and to give a meaning to each that does not defeat the purpose of the others. *Cleveland v. Scio School Dist.,* 30 Or App 945, 949, 569 P2d 35 (1977).

■ Paragraph 5 required that defendant complete the construction of the first leach circuit to the extent that it would be capable of extracting gold from the dump rock.[5] We construe "said operation" in paragraph 6 to mean the operation of that circuit. Once the first circuit was operational, defendant was to determine whether it would function satisfactorily and whether the dump material could be leached at a profit and was then to construct two more pads. We construe "said operation" in paragraph 7 as we construed that phrase in paragraph 6 to mean the cyanide leaching of dump material using the first leach circuit and pad. Given the language of the paragraph and the surrounding circumstances, we believe that the parties intended defendant to have the first circuit running within 60 days.

■ First, substantial work had been done on the first leach circuit before the parties entered the agreement. Vern Jacobson, a mining engineer who had originally undertaken the construction of the Virtue leach system for the Brandenthalers, testified that, as of April, 1979, completion of the system would have taken "probably two to three weeks." The "sprinkler system" and the "carbon recovery units" had to be completed and, except for "sprinkler heads," the required materials were at the site.[6] Second, Brandenthaler held the Virtue mine under a lease-option contract, a copy of a portion of which was attached to the parties' agreement. To exercise the option to purchase, he had to give notice by January 29, 1980, and had to pay

---

[5] A leaching system consists of a non-leaking "pad" on which crushed ore is placed and a series of pipes and pumps to circulate a cyanide solution that, when sprinkled onto the ore, causes gold and precious metals to go into solution.

[6] Before beginning construction of the leaching system, he had run "cyanide extraction tests and recovery tests" and found "the ore at the Virtue was amenable to cyanidation and recovery and it was quite easily extracted."

approximately $70,000 had to be paid by April 30, 1980.[7] Leaching could not be carried out at the Virtue in the winter months. Testing the profitability of that process was to precede full-scale production. Nothing in the record indicates that such testing could have been accomplished other than by using a completed circuit and material from the Virtue dump.[8] On the assumption that the profitability of the process would be of crucial concern to the parties in determining whether to exercise the option to purchase, they had less than nine months from the date the agreement was signed to complete the testing. Third, because the parties intended the net profits from the mining operations to fund the purchase, they would want to get into production as soon as possible. Less than 30 days after the signing of the agreement defendant had workers at the site and according to defendant, his employees had the first leach circuit "completed and ready to go" by June 20, 1979. The conduct of the parties to an agreement is strong evidence of their interpretation of it. *Aspgren v. City of Columbia City,* 34 Or App 991, 1000, 581 P2d 536 (1978). We construe paragraph 7 to mean that defendant was to bring to the site the equipment and personnel required to have the first leaching circuit operating within 60 days of the date the agreement was signed.

There is no reason to conclude that the parties intended to establish a 60-day time limitation in paragraph 12 different from that in paragraph 7. Therefore, the "operations" to be commenced under paragraph 12 refer, as in paragraph 7, to the operation of the first leaching circuit. Defendant contends that "commence operations" has a particular meaning "in mining parlance":

---

[7] We assume that at the time defendant entered the agreement he knew the operative terms of the Virtue lease-option. Paragraph 15 of the agreement stated as follows:

> "All property on Exhibit 'A' through 'H' shall be subject to the estimated debt shown on the instrument attached hereto as such exhibit. CALDWELL shall have the right thereunder to make payment as per contract and deduct said payment from the ONE MILLION SIX HUNDRED THOUSAND DOLLARS ($1,600,000.00) payable to the BRANDENTHALERS.

At trial, defendant agreed that he "wanted that [contract provision] * * * so that if [Mr.] Brandenthaler wasn't able to pay the $75,000 to keep the Virtue Mine, * * * [defendant] could * * * pay that $75,000" himself and thereby "keep the contract alive."

[8] *See* n 11, *infra.*

> "Commencement on an operation which has been debated is when you open a bank account you start employees, you are commencing and you put geologists out in the field."

Jacobson testified that the phrase meant the construction of equipment for mineral extraction. Assuming "commence operations" is a term of art, as defined by defendant, it is not controlling here. The parties used the phrase *"said operation"* to refer to the operation of the first leach circuit. "[C]ommence said operation" means to begin the operation of that circuit. There is no need to resort to "mining parlance" to discern the parties' intent. In construing the remaining requirements of paragraph 12, we refer to paragraphs 5, 6 and 7; *i.e.,* the "operations" are "carried forward as an operation completing the leaching of the * * * dump [material]" by following the sequence of performance and development set out in those paragraphs. Once underway, the leaching was to continue until the "estimated 200,000 ton[s]" of dump material had been processed.

With the exception of the requirement that the first leach circuit be operational by June 20, 1979, there are no specific deadlines for the performance of defendant's duties; however, defendant was not free to proceed at his leisure. *Fremont Lbr. Co. v. Starrell Pet. Co.,* 228 Or 180, 364 P2d 773 (1961), involved the leasing of land for the purpose of developing oil, gas and minerals, and the principal consideration was to be royalties from the minerals extracted. The court held that, because of the nature of the agreement, there existed an implied promise by the lessee "to proceed with reasonable diligence to obtain production." 228 Or at 199. *See also, Bussard v. Binder,* 277 Or 21, 23, 558 P2d 845 (1977); *Yeadon v. Graham,* 273 Or 234, 236, 540 P2d 1007 (1975); *Bennett v. Hebener,* 56 Or App 770, 774-76, 643 P2d 393 (1982). The court concluded that the defendant's failure to pursue operations with due diligence, an implied condition of the lease's continued existence, resulted in automatic termination of the lease:

> " 'It should be observed that this rule of automatic termination is correct not only as a matter of proper and reasonable interpretation of the lease agreements but is based on sound considerations of policy as well. The duty to drill and explore the property, where no substantial cash

consideration is involved, should be treated not as a mere covenant but as a condition to the lease's continued existence for the reason that practically the entire consideration depends on the undertaking. Certainly, the lessee should not be assisted and encouraged to hold the lease for speculative purposes only without making any attempt to develop the property's possible resources. * * *' " 228 Or at 190 (quoting *Richfield Oil Corp. v. Bloomfield,* 103 Cal App 2d 589, 229 P2d 838, 840 (1951)).

■ In this case, the purchase price was to be paid from the net proceeds of gold mining operations at the Virtue. Defendant agreed to complete specified tasks in order to achieve production. The parties agreed that if these tasks were not completed and "carried forward" or if defendant abandoned the development, his right to further operations would terminate immediately. Under these circumstances, we hold that the principles stated in *Fremont Lbr. Co. v. Starrell Pet. Co., supra,* and *Bennett v. Hebener, supra,* apply. To the extent that the parties agreed that defendant was to develop the property in a particular manner (*e.g.,* paragraphs 5, 6, 7, 12), no implied obligations arose; however, an implied duty did exist to discharge those obligations diligently and in good faith. *See Freeport Sulphur Co. v. American Sulphur Royalty Co.,* 117 Tex 439, 6 SW 2d 1039 (1928). Notwithstanding defendant's contention to the contrary, the fact that *this* agreement could ultimately result in a conveyance provides no reason to distinguish this case. *See, e.g.,* cases collected in *Annot.,* 76 ALR2d 710, at 732-34 (1961). The parties clearly intended the contemplated conveyance to be conditional; the Brandenthalers were not required to "turn over" their interests in the properties until the full $1,600,000 was paid from the mining proceeds, and automatic forfeiture was provided for in case defendant failed to carry through with the development.

## DEFENDANT'S PERFORMANCE

■ Defendant testified that, although the first leach circuit was "ready" by June 20, 1979, it was not running then because the rocks were too large to leach effectively and he had no crushing equipment at the site. On July 16, he contracted to purchase a rock crusher, two dump trucks and a "Terex" loader. The machinery was delivered to the

Virtue on July 26. The ore also had to be "de-slimed" before it could be successfully leached. Although we are unable to determine from the record precisely what "sliming" of ore is, it appears that the composition of the dump rock was such that additional processing, through the use of a machine called a "cyclone," was required.[9] According to defendant, by late August or early September the first leaching unit had been completed, the rock crusher and a cyclone had been installed and the system was ready. Nevertheless, the unit was not then operating. In October or the first part of November, the front-end loader needed to load the rock crusher broke down. Defendant had no immediately available replacement. In early November, defendant stopped work and stored the equipment for winter, because "cyanide leaching is impossible at temperatures below 55 degrees Fahrenheit."

The parties had disagreements during this period. Mr. Brandenthaler objected to defendant's bringing unauthorized persons (including potential investors) to the site; they were never able to agree on the formation of a corporation to manage the Virtue development; and there

---

[9] The testimony concerning the details of the mining operation is replete with unexplained terms of art and is, for the most part, confusing, contradictory and unhelpful; *e.g.*:

"We have to crush the material down to least 1/8 to 1/4 inch for cyanide leach. The 1/4 inch would not work. So we installed a crusher with rolls to take it down to a finer mesh. The moment we did so we slimed. What we call sliming with our cyaniding. That sliming then meant that we had to put on units. Additional units to take care of the slime factor for desliming."

Also:

"Q. Okay now, for those of us that aren't miners, would you describe for his Honor a jig and a cyclone, please.

"A. A jig is 42, there's two sets of them. 42 × 42 and it's up in the air quite a ways and they have big suction pumps on the bottom and you get your right amount of water into your jigs and it's . . . will separate all the fine gold and let is come down into the bowl there that we cleaned out of and it run by electric motor.

"Q. Okay, would it be fair in laymen's terms to say it's like a set of screens that you'd shake?

"A. Well,

"Q. Would that be close?

"A. It's got a good action to it up on top. It never moves over oh . . . I'd say a couple of inches. But it's just a jigging action. That's where you get your jig."

were continuing arguments about the progress of defendant's work. In the fall, the Brandenthalers' attorney wrote to defendant's attorney that, in order to resolve the parties' differences, there would have to be a new agreement. On November 2, the Brandenthalers' attorney, at their direction, sent a letter to defendant declaring that he had breached the agreement and that "it is therefore forfeited."

Defendant attributes his failure to fulfill the threshold requirements of having the first circuit operating by June 20, 1979, and thereafter determining whether such operation was "satisfactory and feasible for profit" to the following: (1) Mr. Brandenthaler's ordering him to finish the additional pads *before* operating the first circuit; (2) competition between the leaching and placering operations for water; and (3) "equipment problems." He concludes that "[t]herefore, because the first leach circuit did not 'prove to be satisfactory' and profitable, [he] was not obligated to construct the additional pads."[10] We address the contentions in order.

_____

[10] Defendant does not argue that he did evaluate the profitability of the leaching operation and find that further refinements in crushing and de-sliming were required before that operation was feasible. Further, as noted earlier, he does not explain that the evaluation could be accomplished in any other way than by running the circuit. We mention these points because the record discloses that on September 24, 1979, Wade Dale, a geologist, wrote defendant a letter stating, in part:

"* * * I got the assays back on the 50 tons I sampled on the crusher -1/2 inch material. I had them separate the sample into -20 mesh and plus 20 mesh. Results: -

"Minus 20 mesh (slimes) represents 15% by weight and 35% of the gold content.

"Plus 20 mesh (leach product) - - 85% by weight and 65% of the gold content.

"* * * * *

"At the current rate of $400 per ton you have $6.72/ton in the leach material and about $3.84 in the slimes.

"*These values would give you a very marginal operating outlook* and I can't help but believe that they are much more realistic than what has been reported previously.

"Nine out of ten ores show higher values in the slimes than in the coarser material. The cost of recovering the values from the slimes is usually lower because there is no grinding required.

"Off hand I would say that you can probably separate your slimes with a spiral or rake classifier; discard the slimes and leach the minus 3/8

■ ■ Defendant testified that Mr. Brandenthaler "instructed us not to put the cyanide in the circuit until we built the other leach pads." He explained that "you leach large tonnage, because it takes the same manpower." Although terms of written contracts may be modified by subsequent agreement between the parties, when the modification is oral, it must be shown by "clear and convincing evidence." *Lichty v. Merzenich,* 278 Or 209, 212, 563 P2d 690 (1977) (citing *Mathis v. Thunderbird Village, Inc.,* 236 Or 425, 389 P2d 343 (1964)). Notwithstanding defendant's testimony and other testimony to the effect that the other pads were eventually "all formed and shaped," the evidence does not meet that standard. Furthermore, the trial court apparently rejected this testimony, finding that defendant had agreed that, after the completion of the first circuit, he would determine whether its operation was satisfactory and *then* would construct two additional pads and that he had done neither. We accord considerable weight to the trial court's findings on credibility. *See Gregory v. Weber,* 51 Or App 547, 626 P2d 392 (1981).

Leroy Valentine began a placer operation at the Virtue in late August or early September. He testified that "95 percent" of the equipment he used was his and that there was no "interchange of equipment" between the two operations, which did share the limited supply of water. However, although, according to defendant, at the time the placering began, the leaching system (including the crushing and de-sliming equipment) "was ready for operation," it was not then running. Furthermore, it is hard to believe that just when the leaching circuit was finally in condition to begin processing the dump material, Mr. Brandenthaler "turned his attention to the placer operations," as defendant claims. After the placer operation shut down the first

---

material more economically than trying to treat the slimes in a thickener as I suggested previously." (Emphasis supplied.)

One could infer from the report that by late September, 1979, after considerable work at the site and testing of the ore, the leaching operation had a "very marginal operating outlook," *i.e.,* further equipment refinements were required before leaching would return a profit. Defendant does not make such an argument. We assume that if the report had the suggested significance, defendant certainly would have brought it to our attention.

week in October and water was again available, the leaching unit did not operate. The month-long lack of water was not the reason defendant did not get the leaching process underway before the winter of 1979.

Defendant contends that "equipment problems" slowed the work on the leaching operation: (1) the necessity of purchasing a "cyclone" to "de-slime" the ore, (2) the unavailability of machine parts and (3) the breakdown of the front-end loader needed to load the rock crusher. Those "problems" do not excuse defendant's failure to perform as required. First, he told the Brandenthalers at the time the agreement was signed that he had the necessary equipment and machinery to "start up" the operation. Second, in early April, 1979, defendant employed geologist Robert Hayek to evaluate "the geologic potential for gold production" at the Virtue. Hayek examined the property in detail, including the dump material from which he took samples for analysis. Third, according to defendant, as soon as the crusher began processing the ore, the sliming problem was discovered. However, in a letter dated June 16, 1979, and addressed: "Chain of Mines — Harold Caldwell, Attn: Dr Jan Krason," Jacobson stated:

> "Mr. Caldwell asked that I *reiterate* some of my findings on the Virtue mine and ore, near Baker, Oregon.
>
> "* * * * *
>
> "a. Heap leaching of this ore is practical; however, due to the fines and clay-like minerals in the pile, *crushing and blending of the material is necessary and should not be less than 1/2″-0.*
>
> "b. *In a continuous grinding process, de-sliming should be accomplished prior to Cyanidation.* Due to the gold particle size, gravity (jig) collection of the coarse gold particles should also be considered *prior* to Cyanidation." (Emphasis supplied.)

Defendant, an experienced mine developer, certainly should have known at the time the agreement was signed, or soon thereafter, that a rock crusher was "necessary" in order to have the leaching unit operating by June 20. Defendant's failure to have that equipment at the site earlier than late July was the main cause of asserted delays in resolving the sliming problem and getting the circuit

into operation. Furthermore, the letter noted above indicates that defendant should have anticipated the sliming problem and prepared accordingly. The following principle is applicable:

> "* * * [U]nexpected difficulties and expense do not excuse performance of a contract unless so extreme that a practical impossibility exists and resulting in a hardship so extreme as to be outside any reasonable contemplation of the parties * * *." *Sachs v. Precision Products,* 257 Or 273, 281, 476 P2d 199 (1970),

None of the "equipment problems" cited by defendant was unforeseeable, given the nature of the planned development and the available information, nor did their solution require him to do more than he had agreed to do.

Defendant does not explain why, after all the necessary equipment was in place and there was no shortage of water, he was unable at least to test the profitability of the leaching process. By his own admission, no cyanide ever passed through the circuit. The parties contemplated that an assessment of the operation's feasibility would be accomplished before winter. Nothing in the record shows that, had defendant proceeded in good faith and with reasonable diligence to provide and use the necessary equipment and to resolve his "equipment problems," he would have been unable to achieve that goal. In addition, the evidence shows that defendant failed to provide public liability insurance or to pay the expenses of the operation as required by the agreement. As stated by the trial court:

> "* * * Mr. Cutting resigned his job as operation supervisor on July 23rd, 1980 and in order to collect his past-due wages obtained a judgment upon which he executed and sold the rock crusher, jigs and other items on the premises. In August, 1980 Mr. Freeman repossessed equipment which he had sold to [Caldwell] for non-payment. * * *"

Although these breaches are not expressly made grounds for forfeiture under the agreement, they do indicate a lack of ability on defendant's part to carry out the contemplated development. *See Fremont Lbr. Co. v. Starrell Pet. Co., supra,* 228 Or at 200-01.

We conclude that defendant violated express and implied material terms of the agreement and that under

the circumstances a refusal to enforce the forfeiture would only allow defendant to speculate at plaintiff's expense.

## FORFEITURE

Defendant argues that Mr. Brandenthaler's actions were inconsistent with an intent to declare a forfeiture. We agree with the contrary finding of the trial court:

"After the notice of the forfeiture by Brandenthaler the evidence disclosed that there were efforts at trying to reconcile the differences which existed between the parties but without success. The final meeting prior to Mr. Brandenthaler's death occurred on November 16, 1979. It was a heated and angry confrontation on the part of both and ended with Caldwell's statement that he had to catch a plane. The parting remarks of the decedent were ambiguous and have been interpreted by the witnesses in different ways. *The court is of the opinion, however, that Brandenthaler, as a result of the discussion, re-emphasized his position to terminate the contract and go ahead with the forfeiture.*" [11] (Emphasis supplied.)

Defendant also contends that the trial court erred in declaring that a forfeiture had been effected, because the forfeiture provision was not self-executing and he was not notified of Brandenthaler's intent to declare a forfeiture or afforded an opportunity to cure.

Although a court of equity will not enforce a forfeiture as such directly, forfeiture provision that is self-executing will be enforced. *Roth Develop. v. John Gen'l Contr.*, 263 Or 561, 569-70, 503 P2d 493 (1972). A provision for forfeiture will not be construed as self-executing unless unequivocal language shows clearly that that was the parties' intent. *Roth Develop. v. John Gen'l Contr., supra.* A contract that gives a party alternative remedies for breach will not be construed to be self-executing, and declaration of forfeiture thereunder is not effective, unless the breaching party is given reasonable notice and an opportunity to cure prior to the declaration. *Elsasser v. Wilcox,* 286 Or 775, 779, 596 P2d 974 (1979); *Braunstein v. Trottier,* 54 Or

---

[11] The trial court also found:

"Caldwell apparently continued with his efforts to get the mine into operation and the intervenors forwarded additional funds for their interest as late as December 19, 1979. Mr. Brandenthaler was hospitalized unexpectedly the first part of December and died sometime subsequent thereto."

·App 687, 695, 635 P2d 1379 (1981), *rev den* 292 Or 568 (1982); *see also, e.g., Zumstein v. Stockton, et ux,* 199 Or 633, 264 P2d 455 (1953) (contract gave vendor the "right to declare this agreement null and void or forclose * * * in equity").

 Defendant did not perform as required by paragraph 12 and the implied obligations hereinabove described. In such a case, paragraph 12 provides that

> "CALDWELL'S right to further operations *shall terminate* and CALDWELL shall give peaceful possession of said properties *immediately* to BRANDENTHALERS without *recourse or process of law.*" (Emphasis supplied.)

Nothing but the occurrence of the breach is required to effect the forfeiture, and resort to "recourse or process of law" is expressly excluded. No alternative remedies are provided. The language of the provision is unequivocal, and the intent expressed by the language is clear; *i.e.,* the parties intended the forfeiture provision to be self-executing and we so hold. Our construction is consistent with the preference for automatic termination. *Fremont Lbr Co. v. Starrell Pet. Co., supra.*

### WAIVER

 Defendant asserts that "June 20, 1979, [the 60th day] after the execution of the agreement passed without any protest by [Mr.] Brandenthaler [about nonperformance]" and that, therefore, the Brandenthalers waived forfeiture. In July, Mr. Brandenthaler did protest defendant's failure to get into production but did not declare a forfeiture. Any waiver, however, applied only to the performance then due and not to the requirement of paragraph 12 that he "carry forward * * * [the] operation completing the leaching," which, as discussed above, required the discharge of certain duties under paragraphs 5, 6 and 7, some of which did not have to be completed by June 20. Thus, the waiver, if any, did not apply to defendant's failure to proceed with reasonable diligence and in good faith to test the satisfactory operation and profitability of the first leach circuit and, thereafter, to construct two additional leach pads and complete the leaching of the Virtue dump.

Affirmed.